**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

HENRY D. MCKNIGHT, JR.,

       Plaintiff,

v.

CITY OF TOPEKA, KANSAS, et al.,

       Defendants.

Case No.  19-2353-DDC-GEB

## MEMORANDUM AND ORDER

Plaintiff Henry D. McKnight, Jr. brings claims under 42 U.S.C. § 1983, asserting that Topeka Police Department ("TPD") officers and the City of Topeka, Kansas violated his Fourth and Fourteenth Amendment rights "to be free from unlawful malicious prosecution, detention and imprisonment without probable cause, unlawful search and seizure, arrest, [and] loss of liberty and freedom."  Doc. 24 at 8 (Pretrial Order).

Plaintiff's lawsuit names three defendants:  (1) the City of Topeka, Kansas ("Topeka"), (2) TPD Officer Brandon Uhlrig ("Officer Uhlrig"), and (3) TPD Officer Zachary Goodman ("Officer Goodman").  All three defendants have filed a Motion for Summary Judgment.  Doc. 28.  Officer Uhlrig and Officer Goodman assert absolute and qualified immunity.  Topeka asserts its policy was not the moving force behind the alleged constitutional violations.  Plaintiff has filed a Response, opposing defendants' motion.  Doc. 38.  And, defendants have filed a Reply. Doc. 41.

Much of this dispute centers around one question:  Was plaintiff sleeping?  Plaintiff argues Officer Uhlrig and Officer Goodman lacked probable cause to arrest him for violating Topeka's lurking and prowling ordinance because he was sleeping at the front door of Paisano's

Restaurant when the officers arrived, responding to an alarm call.  Defendants contend they

didn't know if plaintiff was asleep and probable cause existed for the arrest.  Plaintiff was

searched incident to arrest, and the officers found bullets in his pocket, which led to a felon in

possession charge against plaintiff in federal court.  Plaintiff contends the search was unlawful,

defendants knew they lacked probable cause to arrest him, and defendants maliciously

prosecuted him by "intentionally [giving] false or misleading testimony to support the [lurking

and prowling] charge" at his suppression hearing.  Doc. 24 at 4 (Pretrial Order).

## I.    Summary Judgment Facts

The following facts are uncontroverted for purposes of the summary judgment motion or,

where genuinely controverted, are viewed in the light most favorable to plaintiff—the party

opposing summary judgment.  *Scott v. Harris*, 550 U.S. 372, 378–80 (2007).

In the early hours of Christmas Eve in 2016, around 4:02 a.m, Officer Uhlrig and Officer

Goodman, police officers with the TPD, responded to an alarm at Paisano's Restaurant in

Topeka, Kansas.  As one might expect, the restaurant was closed.  And, when the officers

arrived, they saw a person lying on the ground in front of the restaurant's front door.  Officer

Goodman noted the person was wearing a blue sweater and dark pants.  But, before they could

investigate, the officers were called away to another higher priority call.

About half an hour later, Officer Uhlrig and Officer Goodman returned to Paisano's, with

Officer Uhlrig arriving first.  A person—later identified as plaintiff—wearing a blue hooded

sweatshirt still was lying in front of the restaurant's front door, facing the door.  Officer Uhlrig

noted to dispatch upon arriving back at Paisano's that "Our sleeping guy is still here."  Ex. M.

(Dispatch audio 0:02:45–50);[1] *see also* Doc. 38-3 at 26–28 (Uhlrig Dep. 68:7–71:15) (Officer

---

[1]     Defendants filed Exhibits E (Dispatch audio), H (Uhlrig Axon video), J (Uhlrig Axon video), L
(Goodman Axon video), and M (Dispatch audio) conventionally.  *See* Doc. 32.

Uhlrig admitting he called plaintiff "sleeping guy" over the radio and saying he didn't know why

he called him that because he didn't know if he was sleeping or not); Doc. 38-9 at 2 (Tr. of Mot.

Hr'g 16:22–25) (Officer Uhlrig testifying that the first time he arrived at Paisano's "there was a

subject that appeared to be sleeping or possibly on the ground in front of the front doors").

While the officers could observe a person lying on the ground, wearing dark clothing,

plaintiff otherwise was difficult to see clearly because it was dark.[2]  Plaintiff asserts he was

sleeping with his right arm supporting his head.  Doc. 38-2 at 2 (McKnight Aff. ¶¶ 9, 12, 13–15).

Defendants contend plaintiff was lying in front of the door *with his head up off the ground* and

stirred as soon as Officer Uhlrig shined his flashlight on plaintiff and announced himself.  Doc.

29-7 at 8–9 (Uhlrig Police Report) ("[T]he subject was still lying in front of the front doors of

PAISANO'S.  I activated my body worn camera prior to making contact with the subject.  I lit

my flashlight on him [and] announced myself[;] the subject then stirred . . . and he attempted to

---

[2]     Defendants assert that "[p]laintiff was difficult to see" because he was lying on the ground, "there
was little light, and his clothing was fairly dark."  Doc. 29 at 4 (¶ 8).  Plaintiff attempts to controvert
defendants' purported fact that he was difficult to see because there was sufficient light for the officers to
see plaintiff lying on the ground from their vehicles, and the officers were able to describe his position
and color of his clothes.  Doc. 38-3 at 2–3 (Uhlrig Dep. 18:19–19:4) (stating he did see an individual
lying by the front door the first time he went to Paisano's and it appeared to be the same individual who
was there when he returned because the clothing was the same and the individual was lying in the same
position); Doc. 38-4 at 2–3 (Goodman Dep. 15:15–16:4) (describing how he saw a subject lying in front
of the door when he first arrived at Paisano's and sent a description to dispatch before he responded to the
higher priority call).

       The court has reviewed the video evidence submitted by defendants, and it supports defendants'
factual assertion that plaintiff was difficult to see—with the caveat that they were able to see a person
lying on the ground and the color of his clothes.  Ex. H (Axon video 0:00:31–43); *see also* Doc. 29-8 at
17–20 (Tr. of Mot. Hr'g at 17:19–20:7) (Officer Uhlrig's testimony describing how there were some
lights in the parking lot and he could see a subject on the ground but "wasn't able to get a good
description" of him because he could just see a "dark mass . . . laying down on the ground" by the front
door, which was "at a slant in between the side wall and the front wall," and stating that he had to use his
flashlight to see the subject well).  Neither evidence that the officers observed a person lying on the
ground nor that they could see the color of his clothes refutes this fact or presents a genuine issue of
material fact.  The Axon video reveals plaintiff lying in front of Paisano's in the dark early morning
hours, though the officers needed a flashlight to see him more clearly.

stand up."); Ex. H (Uhlrig Axon video 0:00:36–50).  So, defendants controvert plaintiff's claim

he was asleep, and contend from the officers' perspective they couldn't have known if he was

asleep or not.  *See, e.g.*, Doc. 41 at 8–9, 13 (¶¶ 3, 7–8, 34).  Plaintiff controverts defendants'

claim that his head was up off of the ground, citing plaintiff's own affidavit (as well as the Axon

video) stating that he was sleeping with his head supported by his arm.[3]

It is difficult to see from the video whether plaintiff's head was supported by his arm.

The video does reveal that plaintiff was stirring when Officer Uhlrig first shined his flashlight

upon him, and before Officer Uhlrig announced "Hello, Topeka Police.  Are you ok?"  Ex. H

(Uhlrig Axon video 0:00:36–52).  But, it isn't clear whether plaintiff's head was held up off the

ground on its own or resting on an arm.  Nor does the video definitively show whether plaintiff

was asleep.  He was lying down with his head and arms inside his sweatshirt facing the door

when Officer Uhlrig approached.  The court views the evidence in plaintiff's favor on summary

judgment, accepting plaintiff's contention that his head was resting on his arm and he was

---

[3]      Defendants argue the video clearly supports their contention.  Doc. 41 at 3.  And, they object to
plaintiff's affidavit, because a non-moving party cannot challenge an uncontroverted fact to survive
summary judgment by using "'conclusory and self-serving affidavits.'"  *Id.* at 4 (quoting *Hall v. Bellmon*,
935 F.2d 1106, 1111 (10th Cir. 1991)).

The Tenth Circuit explained in *Hall* that "conclusory and self-serving affidavits are not
sufficient" summary judgment evidence but, instead, "affidavits must be based upon personal knowledge
and set forth facts that would be admissible in evidence."  935 F.3d at 1111.  Here, plaintiff's assertion
that he was sleeping with his head resting on his arm is an admissible summary judgment fact because it
is based on his personal knowledge.  *See* Doc. 38-2 at 1 (McKnight Aff. ¶ 2) (declaring that plaintiff is
"personally familiar with the matters contained in this affidavit").

As our Circuit has recognized, "virtually any party's testimony can be considered 'self-
serving[.]'"  *Greer v. City of Wichita*, 943 F.3d 1320, 1325 (10th Cir. 2019).  Nevertheless, self-serving
testimony is "competent" evidence to establish summary judgment facts.  *Id.* (citing *Sanchez v. Vilsack*,
695 F.3d 1174, 1180 n.4 (10th Cir. 2012)); *see also Sanchez*, 695 F.3d at 1180 n.4 ("So long as an
affidavit is 'based upon personal knowledge and set[s] forth facts that would be admissible in evidence,'
it is legally competent to oppose summary judgment, irrespective of its self-serving nature." (quoting
*Hall*, 935 F.2d at 1111)).  So, the court concludes, plaintiff's version of his actions constitutes competent
evidence for the summary judgment process.  The court thus adopts plaintiff's version of these facts in its
summary judgment analysis.

asleep.  The evidence does not reveal, however, that defendants knew with certainty whether plaintiff was asleep.  But, the officers' actions do show that they may have believed plaintiff was sleeping.  Both officers observed plaintiff lying by the front door the first time they arrived at Paisano's.  He still was there when Officer Uhlrig returned.  And, Officer Uhlrig referenced plaintiff sleeping a couple of times that morning—to dispatch and to plaintiff.  He also testified at the suppression hearing that plaintiff could have been sleeping.  *See* Doc. 29-8 at 16, 37, 49, 55–56 (Tr. of Mot. Hr'g 16:22–23 ("[T]here was a subject that appeared to be sleeping or possibly on the ground in front of the front doors . . . ."), 37:5–11 (testifying that, based on his training and experience in "this particular scenario," he believed plaintiff may be intoxicated and "maybe attempted to gain entry into the building for some unknown reason and was just tired and laid down to go to sleep"), 49:18–23 (agreeing the person was in the same position when Officer Uhlrig arrived back at the restaurant, but he "didn't know if he was sleeping" and "didn't know why he was there"), 55:21–56:2 (testifying he didn't know if plaintiff was sleeping because he "didn't get that close to him to see if he was awake or asleep" but admitting plaintiff "could have been" sleeping because he was in the same position)).

Officer Uhlrig approached plaintiff, shined a light on him, and announced "Hello, Topeka Police.  Are you ok?"  Ex. H (Uhlrig Axon video 0:00:36–52).  At the announcement, plaintiff rolled over, pulled his head out of his sweatshirt, and attempted to stand, but fell and hit his head on the sidewalk.  *Id.* (Uhlrig Axon video 0:00:52–1:08).  Plaintiff then stood and immediately started to walk away through the restaurant's patio area.  Officer Uhlrig asked plaintiff if he was okay, asked plaintiff to sit, and asked him to stop walking so he could talk to him.  Plaintiff said, "No, I'm walking the other way" and continued walking.  *Id.* (Uhlrig Axon video 0:01:08–19).  Officer Uhlrig checked that the front doors were locked (they were), then followed plaintiff to

the patio area.  Officer Goodman intercepted plaintiff at the parking lot.  And, when Officer

Uhlrig once again asked plaintiff to sit, plaintiff complied, sitting in a chair on the patio.

Plaintiff was detained during this part of the encounter with the officers, but was not yet under

arrest.

 Officer Uhlrig told plaintiff that they were called to the restaurant because an alarm was

triggered.  Ex. H (Uhlrig Axon video 0:01:34–38).  He also said, "We see the way you're

sleeping in front.  Okay?  We're just here to make sure you're alright.  You're not in any trouble

at this time.  Okay?  We just want to make sure that you're okay."  *Id.* (Uhlrig Axon video

0:01:34–48).  Plaintiff said it was cold—indeed, it was Christmas Eve in Kansas—and Officer

Uhlrig agreed, explaining that this was one reason they wanted to make sure he was okay.

Officer Uhlrig asked plaintiff his name and if he needed any help.  Plaintiff told the officers his

name was Derrick, declined an ambulance, and couldn't identify anyone to come pick him up.

He said that he had no where to go, but that he wanted to leave.  The officers then learned

plaintiff's last name—McKnight—from plaintiff.  Officer Uhlrig testified that although he

offered to call someone to pick up plaintiff, plaintiff wasn't free to leave at this point.  Doc. 38-3

at 11 (Uhlrig Dep. 29:13–20).

 Officer Uhlrig walked across the patio to the side patio door to investigate the alarm,

while Officer Goodman continued talking with plaintiff, asking for his date of birth.  With his

flashlight, Officer Uhlrig discovered a broken door handle on the ground, a handgun, and a

damaged door.[4]  Officer Uhlrig immediately turned back to plaintiff and ordered him to show his

hands and stand up.  Plaintiff stood, took a couple of steps forward, then Officer Goodman

---

[4] Plaintiff doesn't controvert this fact, but asserts it is "misleading" because the officers couldn't connect plaintiff to the patio area where the gun and broken door handle were found.  Doc. 38 at 3 (¶ 20); *see also infra* note 6.

grabbed his arm and secured him.[5]  Officer Uhlrig then explained that he needed to check plaintiff for weapons, patted him down, and found no weapons.[6]  Officer Goodman asked if Officer Uhlrig wanted plaintiff in cuffs, but he was not handcuffed at this point after the pat-down.  Ex. L (Goodman Axon video 0:01:27–39).

The officers had plaintiff sit back down, and Officer Uhlrig went back to searching the patio and front door area.  Sergeant Lam arrived at the scene.  Officer Uhlrig met Sergeant Lam at the front door.  Officer Uhlrig turned off his body camera at this point saying "private conversation."  Ex. H (Uhlrig Axon video 0:04:00–03).  Officer Uhlrig testified that he intended to converse with Sergeant Lam about "the [investigation] that we were dealing with at that time."  Doc. 38-3 at 15 (Uhlrig Dep. 41:1–8).  Officer Goodman remembers seeing Sergeant Lam and

---

[5]       Defendants contend plaintiff attempted to walk away at this point.  Doc. 29 at 6 (¶ 22).  Plaintiff disputes this purported fact, asserting he was complying with Officer Uhlrig's direction when Officer Goodman grabbed him by the arm.  Doc. 38 at 3 (¶ 22).  Defendants argue the video evidence doesn't support plaintiff's view.  Doc. 41 at 4–5.  The court disagrees with defendants' assertion.  While the video does show plaintiff taking a couple of steps forward from the chair after Officer Uhlrig directed plaintiff to show his hands and stand, it does not indisputably show plaintiff trying to walk away from the officers.  Ex. H (Uhlrig Axon video 0:02:35–46).  The court views the evidence in the light most favorable to plaintiff, and it supports a finding or inference that plaintiff was merely complying with Officer Uhlrig's commands.  *See Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a summary judgment motion.").

[6]       Plaintiff's characterization of the fact Officer Uhlrig found the gun, broken door handle, and damaged door as "misleading" is tied to this pat-down.  *I.e.*, plaintiff's position is the officers may have patted him down for officer safety, but the officers couldn't connect plaintiff's presence at the restaurant front door to the patio area where the gun and broken door handle were found and thus they had no reason to believe plaintiff might have a gun or might have caused the damage.  Doc. 38 at 3 (¶ 20); Doc. 38-4 at 6–7 (Goodman Dep. 22:9–23:20) (questioning Officer Goodman about the purpose of the pat-down and framing the question as "[Y]ou had no reason to believe that he had a gun on him, but you were searching for weapons anyway because officer safety was a concern.  Right?").  Officer Goodman testified that he observed Officer Uhlrig pat plaintiff down "to make sure there were no *other* weapons present," but admitted the gun on the patio wasn't found on plaintiff's person and they couldn't connect plaintiff to the weapon found on the patio.  Doc. 38-4 at 6–8 (Goodman Dep. 22:5–24:13 (emphasis added)).  Officer Uhlrig testified he didn't believe probable cause existed to connect plaintiff to the gun on the patio or arrest him for the damage to the door.  Doc. 38-3 at 18 (Uhlrig Dep. 51:5–12).  But, this deposition testimony doesn't dispute the fact that Officer Uhlrig found the gun, broken door handle, and damaged door, and immediately went to pat plaintiff down.

Officer Uhlrig converse and, though he was not a party to that particular discussion, he remembers "lurking and prowling as being a topic of conversation." Doc. 38-4 at 10 (Goodman Dep. 36:2–15). Officer Uhlrig resumed recording and walked with Sergeant Lam to the patio—where Officer Goodman and plaintiff remained—and Officer Uhlrig secured the handgun and cleared it. Ex. J (Uhlrig Axon video 0:00:00–1:00). The first thirty seconds of this Axon video is silent, so any conversation between Sergeant Lam and Officer Uhlrig isn't audible when they first walked toward and reached the patio door.[7]

Topeka has a policy that allows officers to have private conversations among officers and supervisors.[8] Doc. 38-5 at 2 (Lam Dep. 14:14–25); Doc. 38-4 at 9 (Goodman Dep. 29:13–24); Doc. 38-6 at 2 (Salamanca Dep. 12:5–21); *see generally* Doc. 38-7 (TPD Policy and Procedure Manual excerpt describing the uses of recording equipment, which include recording encounters with citizens, documenting events and evidence, assisting with reports and court testimony, enhancing training, and defending litigation and allegations of misconduct).[9] Officer Uhlrig

---

[7]     After the pat-down, Exhibit L (Goodman Axon video) shows Officer Uhlrig on the patio by the door walking toward the front of the building at 0:01:54 and returning with Sergeant Lam at 0:03:06, reaching the patio doors at 0:03:10. Exhibit H (Uhlrig Axon video) shows Officer Uhlrig by the patio door after the pat-down at 0:03:29, proceeding to search the side and front of the building until 0:04:03, when he turned off the camera, stating "private conversation." When Exhibit J of Officer Uhlrig's Axon video resumes, it takes about 10 seconds for Officer Uhlrig and Sergeant Lam to reach the patio doors. So, about 28 seconds passed where Officer Uhlrig's camera was not recording video, supporting plaintiff's position that an off camera conversation took place. Plus, there are 30 seconds without audio when the video resumes. One can hear Officer Goodman interacting with Officer Uhlrig and Officer Lam on Officer Goodman's body camera around the time they reached the patio door (10 seconds into the silent portion of Officer Uhlrig's video), but any conversations between Officer Uhlrig and Sergeant Lam are hard to discern on Officer Goodman's video.

[8]     Defendants object to plaintiff's statements of fact addressing Topeka's recording policy and the private conversations among officers as irrelevant. Doc. 41 at 12 (¶ 24). But, the court includes this information because it is helpful to understand the claim against Topeka, which is the target of some of the summary judgment motion.

[9]     Plaintiff references deposition testimony from Officer Uhlrig discussing TPD's Policy and Procedure Manual, specifically portions of it on page three of the document. Doc. 38-3 at 19–24 (Uhlrig

explains that this policy lists nine situations where officers are supposed to record.  Doc. 38-3 at 20–21 (Uhlrig Dep. 60:18–23; 61:1–2).  The policy also provides exceptions to the recording protocol, including discussions of issues or concerns with another officer or supervisor.  *Id.* at 21–24 (Uhlrig Dep. 61:6–64:14).

Officer Uhlrig testified it is "appropriate to have private conversations" to discuss "tactics and strategies."  Doc. 38-3 at 16–17 (Uhlrig Dep. 43:19–44:4).  But, Officer Uhlrig testified he didn't discuss strategy and tactics or "wanting to find some reason to arrest [plaintiff]" with Sergeant Lam because he "already had a reason to arrest" him.  *Id.* at 17, 24 (Uhlrig Dep. 44:2–4; 64:15–21).  Officer Uhlrig also testified that there wouldn't have been "anything unsafe, impossible, or impractical about recording" his conversation with Sergeant Lam.  *Id.* at 31–32 (Uhlrig Dep. 85:24–86:3).  And, he explains, he typically turns off his camera "to discuss with [his] supervisor the totality of the circumstances involving the call that [they are] currently on." *Id.* at 23 (Uhlrig Dep. 63:20–22).

While Officer Uhlrig investigated and met Sergeant Lam, Officer Goodman stayed with plaintiff.  Officer Goodman learned plaintiff's date of birth.  And Officer Goodman called in "Derrick McKnight" and the date of birth to dispatch, but the dispatcher located no person matching that information.  Plaintiff informed Officer Goodman that he used to work at Paisano's.

Officer Goodman described plaintiff as "super nervous, antsy."  Doc. 29-8 at 70 (Tr. of Mot. Hr'g 70:6–7).  Plaintiff argues the video evidence controverts this description and shows he followed commands and "was only reacting to it being a cold night."  Doc. 38 at 4 (¶ 30).  But, it is how Officer Goodman testified he remembered perceiving plaintiff that night.  And, the court

---

Dep. 59:10–64:14).  But, the document provided by plaintiff with his summary judgment Response contains only one page.  *See* Doc. 38-7.

agrees with defendants that plaintiff doesn't cite any evidence directly contradicting that characterization of Officer Goodman's perception of plaintiff.  Doc. 41 at 5.[10]  Officer Goodman also wrote in his report that "the suspect attempted to pull away a couple of times" when the officers first made contact, but they eventually got him to comply and sit down.  Doc. 29-7 at 12.

Officer Goodman's report continues, asserting that "[t]he suspect kept wanting to get up and leave" while Officer Uhlrig was searching the business.  *Id.* at 13.  Plaintiff argues the video evidence controverts the report's statements about plaintiff wanting to leave and, instead, shows plaintiff "only stood when asked or order[ed] and was only reacting to it being a cold night."  Doc. 38 at 4 (¶ 30).  Defendants reply that the report shows how Officer Goodman perceived plaintiff that night and the video doesn't contradict Officer Goodman's perception that plaintiff kept wanting to get up and leave.  Doc. 41 at 5.  Officer Goodman may have recalled the events in the fashion he recites, but the court agrees with plaintiff.  The video evidence never shows plaintiff trying to get up and leave while Officer Uhlrig was searching the business, save the couple of steps he took when Officer Uhlrig directed him to stand for the initial pat-down.  Plaintiff is not on camera at all times, however.  Ex. L (Goodman Axon video 0:00:00–4:20).  The court accepts plaintiff's view of these events in the summary judgment facts it uses to decide this motion.

When Officer Uhlrig and Sergeant Lam returned to the patio and after the gun was cleared, Officer Goodman said "Let's just, now, since he's cold, let's get him in the car."  *Id.* (Goodman Axon video 0:04:15–20).  Plaintiff stated he didn't want to get in the car.  But, at this

---

[10]     A reasonable person observing Officer Goodman's Axon video, however, could interpret plaintiff's behavior differently.  For instance, once stopped on the patio, the video shows plaintiff sat as directed, fist bumped Officer Goodman, laughed, repeatedly commented on the cold, appeared to try to stay warm, and sat while watching the officers investigate.  *See* Ex. L (Goodman Axon video 0:01:19–4:15).

point, the officers placed plaintiff under arrest for lurking and prowling in violation of a Topeka

ordinance (though they didn't verbally announce the basis for the arrest when they handcuffed

plaintiff).  Ex. J (Uhlrig Axon 0:01:05–2:15); Ex. L (Goodman Axon video 0:04:20–5:13).

Officer Uhlrig directed plaintiff to stand and placed plaintiff under arrest.  Officer Goodman

secured plaintiff while Officer Uhlrig handcuffed him.

After securing plaintiff in handcuffs, Officer Uhlrig searched him.  He found a cellphone,

keys, a state probation officer's business card, and six bullets.  Ex. J (Uhlrig Axon video

0:02:15–4:05); Ex. L (Goodman Axon video 0:05:13–7:06).  The officers still had not positively

identified plaintiff at this time.  And Sergeant Lam directed them to run plaintiff's name through

the interstate identification index.  They ran the search, but still couldn't positively identify

plaintiff.

Officer Uhlrig and Sergeant Lam examined the items discovered on the premises and

from searching plaintiff.  At this point, Officer Uhlrig told Sergeant Lam he didn't know if

probable cause existed to charge plaintiff with criminal damage, because he found plaintiff by

the front door and not in the patio area, but he did believe there was probable cause for

"prowling."  Ex. J (Uhlrig Axon video 0:06:15–7:08); Doc. 38-3 at 18 (Uhlrig Dep. 51:1–12)

(noting plaintiff could be connected to the gun or door damage, but he didn't have probable

cause for an arrest based on those items at that time).  Sergeant Lam suggested Officer Uhlrig

should ask plaintiff his name and tell him that, if he wasn't truthful, they could charge him for

that conduct and inform his probation officer.  Officer Uhlrig asked Sergeant Lam if he should

Mirandize plaintiff before asking him his name.  Ex. J (Uhlrig Axon video 0:07:29–40).

Then, Officer Uhlrig went to talk to plaintiff, while Officer Goodman and Sergeant Lam

continued to investigate the restaurant.  Officer Goodman and Sergeant Lam found the back door

unlocked and went in and made sure no one was inside the restaurant.  Meanwhile, Officer

Uhlrig learned plaintiff's name was Henry D. McKnight, Jr., and his middle name—the one

initially given the officers—was Derrick.  Dispatch was able to find a photo for a Henry D.

McKnight, Jr., which the officers determined matched plaintiff.  And, when they ran that name

through the interstate identification index it returned a conviction for aggravated assault.

Plaintiff was taken to Shawnee County Corrections and booked in to jail.

The officers' reports following the incident discuss their reasoning behind the lurking and

prowling arrest.  Officer Uhlrig's report states:  "It was determined due to the alarm as well as

the criminal damage to the business at the very least we would charge the suspect with lurking

and prowling."  Doc. 29-7 at 10.[11]  Officer Goodman's report states he told Officer Uhlrig "due

to the nature of the suspect's behavior, [ ] he should be detained, at which point [the officers]

came over and placed the suspect into custody for lurking and prowling."  Doc. 29-7 at 13.[12]

---

[11]    Also, the parties don't controvert that Officer Goodman testified in his deposition "that the factors he considered in the totality of the circumstances for probable cause included having an alarm at 4 am, [plaintiff] being present, [plaintiff] attempting to walk away, and a broken door handle being found at the scene."  Doc. 38 at 14–15 (¶ 82) (citing Goodman Dep. at 49:3–10); Doc. 41 at 15 (¶ 41) (Reply noting this fact is uncontroverted).  But, neither party attached the relevant pages of deposition testimony in the materials submitted for the summary judgment record.

The same condition exists for the uncontroverted fact asserted by plaintiff that "[p]rior to the arrest for lurking and prowling, S[e]rgeant Lam was told that [plaintiff] had been uncooperative," which Officer Lam believed was the case because plaintiff had walked "away when . . . first encountered," didn't give "his full legal name," and was offered help, but responded by walking away.  Doc. 38 at 15 (¶¶ 83–84) (citing Lam Dep. at 61:11–24, 64:3–14); Doc. 41 at 15 (¶ 41) (Reply noting facts are uncontroverted).

[12]    Plaintiff attempts to controvert the purported fact that his behavior played any role in arresting him for lurking and prowling because "[t]he referenced document makes no mention of plaintiff's behavior as a factor."  Doc. 38 at 4 (¶ 31).  But, this omission likely was caused by a reference to the wrong page of the record.  Defendants identified Exhibit F, page CITY0012 in their original motion.  Doc. 29 at 7 (¶ 31).  And, as plaintiff correctly asserts, this page never mentions his behavior.  But, in their Reply, defendants cite Exhibit F, page CITY0013, and that excerpt of the summary judgment record does mention plaintiff's behavior.  Doc. 41 at 5.

Plaintiff attempts to controvert the purported fact that the alarm or damage to the business factored into his arrest for lurking and prowling because the officers admitted they could not connect plaintiff to the gun or damage on the patio.  Officer Goodman indeed testified that the gun on the patio wasn't found on plaintiff's person and thus they couldn't connect plaintiff to it. Doc. 38-4 at 7–8 (Goodman Dep. 23:23–24:13).  Officer Uhlrig testified that he did not have probable cause to connect plaintiff to the gun on the patio at the time or arrest him for the damage to the door.  Doc. 38-3 at 18 (Uhlrig Dep. 51:1–12).[13]  And, Sergeant Lam testified they had no way to connect plaintiff to the door damage.  Doc. 38-5 at 7 (Lam Dep. 53:14-25).[14] Defendants argue that whether the officers could connect plaintiff to the damage to the door or the gun is "a legal argument couched as fact," so the court shouldn't accept their testimony as true facts.  Doc. 41 at 11 (¶ 18).  To decide the summary judgment facts governing the current motion, the court need not decide to what extent, if any, the gun or door damage supports a legal determination that probable cause existed for the lurking and prowling arrest.  The summary judgment facts show two things.  One, Officer Uhlrig listed those factors in his report to support the arrest.  Two, the video evidence and deposition testimony show the officers subjectively didn't believe *probable cause* existed to connect plaintiff to the gun or damaged door when they arrested him for lurking and prowling, though they may have suspected a connection.[15]

---

[13]     Plaintiff cites page 46 of the Uhlrig Deposition but did not attach that page as part of the summary judgment record.  The court assumes plaintiff intended to reference page 51, which does discuss probable cause and plaintiff's connection (or lack of it) to the gun and door damage.  *See also* Doc. 38 at 9 (¶ 32) (citing page 51 of the deposition).

[14]     Plaintiff cites page 49 of the Lam Deposition but did not attach that page as part of the summary judgment record.  The court assumes plaintiff intended to reference page 53, where Sergeant Lam discussed the lurking and prowling ordinance and criminal damage.  *See also* Doc. 38 at 9 (¶ 32 citing page 53 of the deposition).

[15]     Plaintiff also attempts to submit as evidence on summary judgment that the officers had electronic copies of the TPD's policies and Topeka's municipal ordinances available to them at the time of arrest, but they chose not to look at them.  Doc. 38 at 13 (¶¶ 70–71).  And, plaintiff asserts, despite

A criminal case was commenced against plaintiff in Shawnee County, Kansas District Court, and a state court judge found probable cause existed to arrest plaintiff for criminal possession of a firearm by a convicted felon. Doc. 29-15 at 2–3; Doc. 38-8 (Uhlrig Aff. for state charge).[16] He was charged with criminal possession of a firearm in state court on December 30, 2016, and indicted for that charge by a Kansas grand jury on January 18, 2017. Doc. 29-16 at 1–2; Doc. 29-17 at 1–2. Plaintiff then was indicted by a federal grand jury on March 8, 2017, for

_____

making comments about plaintiff sleeping, Officer Uhlrig never told Sergeant Lam that plaintiff was asleep when they arrived before arresting plaintiff. But, the court can't locate the evidence cited by plaintiff to support these propositions anywhere in the summary judgment record, as the pages he cites are not included with Officer Uhlrig, Officer Lam, or Officer Goodman's deposition excerpts provided by the parties. Defendants also argue this evidence is immaterial. Doc. 41 at 13 (¶ 32). It's true. Whether the officers examined the ordinance at the time of arrest, or told Sergeant Lam about plaintiff's initial position on arrival, doesn't affect whether probable cause existed because probable cause is determined objectively based on the known facts. *See Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("Whether probable cause exists depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest."); *id.* at 153 ("[A]n arresting officer's state of mind (except for the facts that he knows) is irrelevant to the existence of probable cause."); *see also Stonecipher v. Valles*, 759 F.3d 1134, 1141 (10th Cir. 2014) (explaining probable cause requires more than a mere suspicion of unlawful activity; it requires "a substantial probability . . . that the suspect committed the crime" (citation and internal quotation marks omitted)); *Romero v. Fay*, 45 F.3d 1472, 1476 (10th Cir. 1995) ("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed . . . an offense.").

[16]   Defendants' statement of facts asserts simply that "[a] criminal case was filed" in state court and the judge "found probable cause for the arrest." Doc. 29 at 9 (¶ 46). But, as plaintiff correctly argues, defendants have provided no evidence definitively showing the judge found probable cause to arrest plaintiff *for lurking and prowling*. Doc. 38 at 5 (¶ 46). All of the state court documents reference a charge of criminal possession of a weapon, and never indicate the state court judge considered whether probable cause existed to arrest plaintiff for lurking and prowling. The probable cause finding does contain a check mark by "officer had probable cause to detain at arrest." Doc. 29-15 at 2. But, the judge's memorandum mentions only the "most serious offense involved"—criminal possession of a firearm. *Id.* Likewise, Officer Uhlrig's affidavit never mentions lurking and prowling and identifies the crime as criminal possession of a firearm. Doc. 38-8 (Uhlrig Aff. for state charge). Though, the affidavit does describe handcuffing and searching plaintiff before learning he had a felony conviction. *Id.*

        While a judge may have found defendants had probable cause to arrest plaintiff for the state charge—and, at this point, plaintiff became detained pursuant to legal process—the order of events here is important for the legality of the initial search incident to arrest that led to the federal charge. As described above, defendants found the gun on the patio, patted down plaintiff and found no weapons, arrested plaintiff for lurking and prowling, then searched him and found bullets. Only after that search did they locate plaintiff in the interstate identification index and learn of his prior conviction that prohibited him from possessing ammunition.

felony possession of ammunition.  *See* Indictment, *United States v. McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Mar. 8, 2017), ECF No. 1.  And, the state charge was dismissed on March 10, 2017.  Doc. 29-18.  He was arraigned on the federal charge on April 13, 2017.  Minute Entry, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Apr. 13, 2017), ECF No. 5.

In the federal criminal case before the undersigned judge, plaintiff moved to suppress the evidence of the bullets based on lack of probable cause to arrest.  Motion to Suppress, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Aug. 4, 2017), ECF No. 15.  The court held an evidentiary hearing on the motion to suppress on August 29, 2017, and received Axon video evidence and testimony from Officer Goodman and Officer Uhlrig.  *Id.* (D. Kan. Aug. 29, 2017), ECF No. 27.

At the suppression hearing, Officer Uhlrig was asked "when you make contact with an individual" lying on the ground around 4 a.m. when responding to an alarm call like the officers received that night, "what sorts of things do you, as a trained officer, think about" and do you "think anything about the circumstances of why someone might be laying on the ground against a business . . . that's closed . . . ?"  Doc. 29-8 at 36 (Tr. of Mot. Hr'g 36:13–25).  Officer Uhlrig testified that, based on his training and experience in "this particular scenario," he believed plaintiff might be intoxicated and "maybe attempted to gain entry into the building for some unknown reason and was just tired and laid down to go to sleep."  *Id.* at 37 (Tr. of Mot. Hr'g 37:5–11).[17]  Officer Uhlrig also testified that when he found plaintiff, he was not hiding, but he was lying down and Officer Uhlrig didn't know if he was awake or asleep.  *Id.* at 55 (Tr. of Mot. Hr'g 55:7–24); *see also id.* at 16 (Tr. of Mot. Hr'g 16:22–25).  Officer Goodman testified that

---

[17]     Defendants controvert plaintiff's citation to this testimony, arguing nothing in the record shows plaintiff actually was asleep and the testimony is irrelevant to their summary judgment motion.  Doc. 41 at 13–14 (¶ 34).  They also object to other suppression hearing testimony as irrelevant and immaterial. *See, e.g.*, *id.* at 14 (¶¶ 35–37).  But, because plaintiff's malicious prosecution claim is tied to the suppression hearing testimony, the court accepts the properly supported portions the officers' testimony as part of the summary judgment facts.

when he arrived at Paisano's the second time, plaintiff was walking away from Officer Uhlrig, and he neither observed nor was he told what plaintiff was doing before that point.  *Id.* at 83–84 (Tr. of Mot. Hr'g 83:25–84:3).

The court denied the suppression motion.  Doc. 29-12 at 8–9.  The court found the officers had probable cause to arrest plaintiff for lurking or prowling under the Topeka ordinance.  It provides:  "It shall be unlawful for any person to be found lurking, lying in wait or concealed in any house or other building or any yard, premises or street with the intent to do any mischief or to pilfer or to commit any crime or misdemeanor whatever."  *Id.* at 8 (quoting Topeka City Code § 9.45.070).

After the court denied plaintiff's motion, he pleaded guilty to the federal charges and was sentenced to 37 months in federal prison followed by three years supervised release and was taken into custody.  Petition to Enter Plea of Guilty and Order Entering Plea, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Jan. 11, 2018), ECF No. 45; Judgment, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. June 12, 2018), ECF No. 53.  He appealed the court's ruling on the motion to suppress to the Tenth Circuit.  Notice of Appeal, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. July 10, 2018), ECF No. 57; Appellant's Opening Brief, *United States v. McKnight*, No. 18-3144 (10th Cir. Nov. 26, 2018), Doc. 010110088997.  The government didn't oppose plaintiff's arguments on appeal, and instead requested the Tenth Circuit remand the case and reverse the district court's findings.  Appellee's Motion to Remand, *McKnight*, No. 18-3144 (10th Cir. Dec. 20, 2018), Doc. 010110100596.

The government's brief to the Tenth Circuit stated:

The government agrees that, on the facts here, the police lacked probable cause to arrest [plaintiff] so as to justify a search incident to arrest.  Because the arrest and resulting search violated [plaintiff's] Fourth Amendment rights, the government

agrees that the district court's order should be reversed and the case remanded for further proceedings.

*Id.* at 7.  The government couldn't locate any decisions addressing Topeka's lurking and prowling ordinance.  *Id.*  It agreed with plaintiff's argument to the Circuit that "some form of concealment" was required.  *Id.*  But, the government conceded on appeal that the video evidence doesn't show plaintiff was concealed when the officers found him.  *Id.* at 7–8.  And, the government also agreed with plaintiff that "the available evidence did not support a reasonable inference that [plaintiff], when found, harbored a present or prospective intent to engage in mischief or criminal conduct" because they found him lying down and he appeared to be sleeping.  *Id.* at 8.  Nor could the officers connect him to past conduct at the restaurant to justify a warrantless arrest.  *Id.*  So, the government concluded, the officers "lacked information sufficient to warrant a reasonable belief that [plaintiff] was found 'lurking, lying in wait or concealed' with the 'intent to do any mischief or to pilfer or commit any crime or misdemeanor whatever.'"  *Id.* at 7.

The Tenth Circuit granted the unopposed motion to remand the next day in a summary order.  Order and Judgment, *McKnight*, No. 18-3144 (10th Cir. Dec. 21, 2018), Doc. 010110101626; *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Dec. 21, 2018), ECF No. 69. Following remand, the government moved to dismiss the case.  Unopposed Motion to Dismiss Indictment, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Jan. 2, 2019), ECF No. 71.  The court dismissed the case on January 4, 2019.  Order, *McKnight*, No. 17-cr-40020-DDC-1 (D. Kan. Jan. 4, 2019), ECF No. 72.[18]

---

[18]      Many of plaintiff's statements of purported fact in his Response cite to evidence that plaintiff failed to include in the record, so the court cannot consider them here.  *See, e.g.*, Doc. 38 at 15–17 (¶¶ 85, 86–91, 93–102, 108); *see also* D. Kan. Rule 56.1(b)(2) (requiring non-movant to support facts with "references to the record"); Fed. R. Civ. P. 56(c)(1) (requiring parties to support summary judgment facts by "citing to particular parts of the materials in the record"); *Cross v. Home Depot*, 390 F.3d 1283, 1290

## II.       Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "no genuine dispute" exists about "any material fact" and that it is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  When it applies this standard, the court "view[s] the evidence and make[s] inferences in the light most favorable to the non-movant."  *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (citing *Oldenkamp v. United Am. Ins. Co.*, 619 F.3d 1243, 1245–46 (10th Cir. 2010)).

"An issue of fact is 'genuine' 'if the evidence is such that a reasonable jury could return a verdict for the non-moving party' on the issue."  *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d 1145, 1150 (D. Kan. 2012) (explaining that "[a]n issue of fact is genuine if the evidence allows a reasonable jury to resolve the issue either way" (citation and internal quotation marks omitted)).  "An issue of fact is 'material' 'if under the substantive law it is essential to the proper disposition of the

---

(10th Cir. 2004) (explaining that, on a motion for summary judgment, "'it is the responding party's burden to ensure that the factual dispute is portrayed with particularity, without . . . depending on the trial court to conduct its own search of the record'" and the district court has no obligation "'to comb the record in order to make [the party's] arguments for him'" (first quoting *Downes v. Beach*, 587 F.2d 469, 472 (10th Cir. 1978); then quoting *Mitchell v. City of Moore*, 218 F.3d 1190, 1199 (10th Cir. 2000)); *Simon v. Grafton, Inc.*, Nos. 12-2796-JAR, 12-2797, 2014 WL 3661098, at *2 (D. Kan. July 23, 2014) (disregarding portions of plaintiff's summary judgment motion that did not contain any citations to the record and where plaintiff "did not provide any affidavits, depositions, declarations, nor any other support for his statement of facts" because they didn't comply with Fed. R. Civ. P. 56 or D. Kan. Rule 56.1); *Elrod v. Walker*, No. 06-3115-SAC, 2011 WL 6372881, at *1, 6 & n.3 (D. Kan. Dec. 20, 2011) (explaining a party "must come forward with admissible evidence establishing each fact he relies upon" and must present those facts "by affidavit, declaration under penalty of perjury, or other state discovery" (citation and internal quotation marks omitted)).

Defendants controvert these unsupported sections or argue many of the referenced sections don't comply with the summary judgment rules or are irrelevant and immaterial.  Doc. 41 at 15–17 (¶¶ 40, 43–44, 46–48).  As will become evident below, even if properly presented and accepted as summary judgment facts, plaintiff's purported facts would not have allowed his claims to survive summary judgment.  So, the court need not give plaintiff an opportunity to support the facts properly, but grants defendants' summary judgment motion.  *See* Fed. R. Civ. P 56(e)(4) (permitting the court to "issue any other appropriate order").

claim' or defense." *Nahno-Lopez*, 625 F.3d at 1283 (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (citing *Anderson*, 477 U.S. at 248)); *see also Anderson*, 477 U.S. at 248 (explaining a material issue of fact is one that has the ability to "affect the outcome of the suit under the governing law").

The moving party bears "'both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law.'" *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (quoting *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002)).  To meet this burden, the moving party "'need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim.'" *Id.* (quoting *Sigmon v. CommunityCare HMO, Inc.*, 234 F.3d 1121, 1125 (10th Cir. 2000)); *see also In re Urethane Antitrust Litig.*, 913 F. Supp. 2d at 1150 (explaining that "a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." (citation omitted)).

If the moving party satisfies its initial burden, the non-moving party "'may not rest on its pleadings, but must bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof.'" *Kannady*, 590 F.3d at 1169 (quoting *Jenkins v. Wood*, 81 F.3d 988, 990 (10th Cir. 1996)); *see also Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 248–49.  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671 (citing *Thomas v. Wichita Coca-Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.), *cert. denied*, 506 U.S. 1013 (1992)); *see also Celotex*, 477 U.S. at 324 (explaining the nonmovant

must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial" (citations and internal quotation marks omitted)).  When deciding whether the parties have shouldered their summary judgment burdens, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

Finally, summary judgment is not a "disfavored procedural shortcut." *Celotex*, 477 U.S. at 327.  Instead, it is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* (quoting Fed. R. Civ. P. 1).  "The very purpose of a summary judgment action is to determine whether trial is necessary." *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995).

### III.    Analysis

Plaintiff asserts two claims:  (1) a § 1983 claim against each defendant for depriving plaintiff "of his clearly-established federally-protected rights to be free from unlawful malicious prosecution, detention and imprisonment without probable cause, unlawful search and seizure, arrest, [and] loss of liberty and freedom under the 4th and 14th Amendments to the United States Constitution and Kansas Bill of Rights," and (2) a § 1983 claim against Topeka because the Chief of Police of the TPD created a policy that allowed police officers to have off-the-record conversations, and, plaintiff asserts, through this policy Topeka "established a policy or practice" that Topeka "knew or should have known" would be misused and "would result in the deprivation" of citizen's constitutional rights.  Doc. 24 at 8.

The court previously dismissed plaintiff's § 1983 claims for false arrest or false imprisonment violating the Fourth Amendment because they are time-barred.  Doc. 23 at 6–11

(explaining the statute of limitations for § 1983 claims is drawn from Kansas's personal injury statute, and for false imprisonment plaintiff's claims began to accrue when legal process was instituted); *see also Young v. Davis*, 554 F.3d 1254, 1257 (10th Cir. 2009) (explaining false arrest/false imprisonment claims "arise[] out of detention without legal process" and malicious prosecution claims "arise[] out of detention after the wrongful institution of legal process," and a plaintiff's false arrest or false imprisonment claims begin to accrue on the date plaintiff is first held under legal process, for example on the date of a judicial determination of probable cause following a warrantless arrest or when an arrest warrant is issued); *Mondragón v. Thompson*, 519 F.3d 1078, 1082–84 (10th Cir. 2008) ("The period of time between an unlawful arrest and the institution of legal process forms one constitutional claim, arising under the Fourth Amendment. That claim accrues when the plaintiff is released or legal process is instituted justifying that imprisonment. The period of time between the institution of that process and its favorable termination . . . forms a second claim, arising under the Due Process Clause. That claim accrues, at the earliest, when favorable termination occurs."). But, the court agreed that plaintiff timely asserted his § 1983 claims based on a malicious prosecution theory under the Fourth and Fourteenth Amendments because the malicious prosecution claims began to accrue when plaintiff's federal criminal case was terminated. Doc. 23 at 7, 9–11; *see also Myers v. Koopman*, 738 F.3d 1190, 1194–95 (10th Cir. 2013) (explaining the Fourth Amendment can support a § 1983 malicious prosecution claim after the institution of legal process too).

A plaintiff must prove five elements to prevail on a § 1983 malicious prosecution claim: "'(1) the defendant caused the plaintiff's continued confinement or prosecution; (2) the original action terminated in favor of the plaintiff; (3) no probable cause supported the original arrest, continued confinement, or prosecution; (4) the defendant acted with malice; and (5) the plaintiff

sustained damages.'"  *Sanchez v. Hartley*, 810 F.3d 750, 754 n.1 (10th Cir. 2016) (quoting *Wilkins v. DeReyes*, 528 F.3d 790, 799 (10th Cir. 2008)).  "[T]he ultimate question is whether plaintiff has proven the deprivation of a constitutional right" under the Fourth and Fourteenth Amendments.  *Novitsky v. City of Aurora*, 491 F.3d 1244, 1257 (10th Cir. 2007).

Defendants argue the court must grant summary judgment in their favor because plaintiff can't satisfy three elements of his § 1983 malicious prosecution claims.  *First,* defendants argue the officers had probable cause or arguable probable cause to arrest plaintiff.  *Second*, defendants contend that plaintiff has not adduced evidence capable of supporting a finding that defendants acted with malice.  *Third*, defendants argue plaintiff's prosecution didn't terminate in his favor.  Because plaintiff fails to satisfy these three elements of his malicious prosecution claim, defendants argue, Officer Uhlrig and Officer Goodman are entitled to qualified immunity because plaintiff hasn't shown they violated plaintiff's federal constitutional or statutory rights.  And, even if a constitutional violation occured, defendants contend that the law was not clearly established so qualified immunity still applies.  Officer Goodman and Officer Uhlrig also argue that they are entitled to absolute immunity for their testimony at the suppression hearing.  And, for the claim against Topeka, defendants argue the body camera recording policy was not the moving force behind plaintiff's alleged unlawful arrest and malicious prosecution.

### A.     Qualified Immunity for Officer Uhlrig and Officer Goodman

The individual defendants assert a qualified immunity defense to plaintiff's § 1983 malicious prosecution claims.  Doc. 29 at 11.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably."  *Id.*  "The protection of qualified immunity applies regardless of whether the government official's error is 'a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact.'"  *Id.* (quoting *Groh v. Ramirez*, 540 U.S. 551, 567 (2004)).  Qualified immunity is "'immunity from suit rather than a mere defense to liability.'"  *Id.* (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)).  So, courts should resolve qualified immunity questions "'at the earliest possible stage in litigation.'"  *Id.* (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The Supreme Court has "mandated a two-step [inquiry] for resolving government officials' qualified immunity claims."  *Id.* at 232 (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  First, a court must decide whether plaintiff has come forward with facts that "make out a violation of a constitutional right."  *Id.*  Second, the court must determine whether "the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Id.*  Unless the official's alleged conduct violated a clearly established constitutional right, qualified immunity applies.  *Id.*

Once a qualified immunity defense is raised, "plaintiff bears the burden of meeting these two prongs."  *Hinkle v. Beckham Cnty. Bd. of Cnty. Comm'rs*, 962 F.3d 1204, 1219 (10th Cir. 2020).  The court has discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson*, 555 U.S. at 236.  "If the plaintiff fails to satisfy either part of the two-part inquiry, the court must grant the defendant[s] qualified immunity."  *Medina v. Cram*, 252 F.3d 1124, 1128

(10th Cir. 2001). "If the plaintiff successfully establishes the violation of a clearly established right" the summary judgment burden shifts back to defendants "who must prove that there are no genuine issues of material fact and that [they are] entitled to judgment as a matter of law." *Id.*

Throughout the qualified immunity analysis on summary judgment, the court must "review the evidence in the light most favorable to the nonmoving party." *Id.* But, to overcome a qualified immunity defense, "the record must clearly demonstrate the plaintiff has satisfied his heavy two-part burden." *Id.* So, the court doesn't weigh the evidence and still applies the traditional summary judgment standard—*i.e.*, the court must view the evidence in the light most favorable to the non-moving party and draw inferences and resolve genuine disputes of material fact in favor of the non-moving party. *Hinkle*, 962 F.3d at 1219. But, for plaintiff's claims "to survive summary judgment, the record must contain facts that rebut the presumption of the officers' immunity from suit." *Medina*, 252 F.3d at 1130.

So, applying the strictures of the qualified immunity doctrine, the court must determine whether Officer Uhlrig and Officer Goodman violated plaintiff's clearly established constitutional right to be free from malicious prosecution under the Fourth and Fourteenth Amendments when they testified about their basis for the lurking and prowling arrest at his suppression hearing. *See* Doc. 24 at 8, 10 (asserting Fourth and Fourteenth Amendment violations for unlawful malicious prosecution following unlawful search and seizure, and seeking damages for malicious prosecution resulting in plaintiff's imprisonment without probable cause); *see also Margheim v. Buljko*, 855 F.3d 1077, 1085 (10th Cir. 2017) (explaining "the relevant constitutional underpinning for a claim of malicious prosecution under § 1983" is "the Fourth Amendment's right to be free from unreasonable seizures" (citations and internal quotation marks omitted)); *Wilkins*, 528 F.3d at 797–98 (analyzing § 1983 malicious prosecution claim

based on a Fourth Amendment "right to be free from unreasonable seizures . . . in light of Fourth Amendment guarantees" and explaining a malicious prosecution claim exists "only when a plaintiff alleges the legal process itself to be wrongful"); *Schoenfeld v. Thompson*, No. 16-cv-02630-MSK-NYW, 2017 WL 8944003, at *5 (D. Colo. June 7, 2017) (explaining that the Tenth Circuit has recognized malicious prosecution claims, claims "premised on the theory that the defendant initiated or continued a proceeding against the plaintiff without probable cause," as viable under § 1983, and noting Fourth Amendment malicious prosecution claims—where the claims assert "unreasonable seizures imposed with legal process"—focus on whether "the legal process itself was wrongful").

The next two subsections address both prongs of the qualified immunity question. The first part considers prong one—whether plaintiff has shown defendants violated his constitutional right against malicious prosecution. Part two takes up the second prong of the analysis.

### 1.     Has Plaintiff Shown Officer Uhlrig and Officer Goodman Violated a Constitutional Right?

Plaintiff contends the officers knew he was sleeping and could not have been lurking or prowling under the terms of Topeka's ordinance. So, plaintiff argues, defendants knew they lacked probable cause to arrest plaintiff for lurking and prowling and their testimony at the suppression hearing about probable cause for that arrest was false and misleading. This false and misleading testimony, plaintiff alleges, led to his continued incarceration on the felon in possession of ammunition charge. Defendants argue that plaintiff hasn't shown the officers violated his constitutional right to be free from malicious prosecution because: (1) they had probable cause or arguable probable cause to arrest plaintiff, (2) plaintiff can't show they acted with malice because their testimony was consistent with their encounter with plaintiff and wasn't

false and misleading, and (3) plaintiff's original action didn't terminate in a manner indicative of plaintiff's innocence.  Doc. 29 at 12–13.

For reasons explained below, the court concludes defendants' third argument—favorable termination—is fatal to plaintiff's § 1983 claims.  As the Tenth Circuit has explained, if plaintiff fails to establish any of the essential elements of a malicious prosecution claim, he fails to establish a constitutional violation.  *Margheim*, 855 F.3d at 1087 ("Mr. Margheim is pursuing a malicious prosecution claim, and therefore, to satisfy the first part of his burden [to overcome qualified immunity], he must show the five elements of his claim to establish a [constitutional] violation").  Plaintiff hasn't presented a triable issue whether the original action terminated in his favor.  And, because plaintiff can't establish this essential element of his § 1983 malicious prosecution claims, he hasn't shown a constitutional violation and defendants are entitled to qualified immunity.  *See id.* at 1090 (Tenth Circuit rejecting plaintiff's arguments that a plaintiff asserting a § 1983 malicious prosecution claim need not prove all five common law elements because "in our circuit, the elements of § 1983 malicious prosecution claims are already established").

A favorable termination means the original criminal proceeding must terminate in a manner indicative of plaintiff's innocence.  *Margheim*, 855 F.3d at 1086, 1089.  Dismissal of criminal charges alone doesn't indicate innocence.  *Id.* at 1086.  Instead, the court must examine the reasons for the dismissal and the circumstances surrounding it to see if it was indicative of innocence.  *Id.*  For instance, a dismissal after evidence is suppressed on technical grounds— where the evidence's trustworthiness isn't questioned—may not indicate innocence.  *Id.*  But, if "a court vacate[s] the conviction because the plaintiff was factually innocent" that would suffice. *Montoya v. Vigil*, 898 F.3d 1056, 1066 (10th Cir. 2018) (citation and internal quotation marks

omitted).  "If, in view of the circumstances, the case [was] disposed of in a manner that leaves the question of the accused's innocence unresolved, there generally can be no malicious prosecution claim by the accused."  *Id.*  Only when the proceedings terminate in a way that touches the merits, do the criminal proceedings terminate favorably.  *Id.*

Here, defendants and plaintiff focus their "favorable termination" arguments on the lurking and prowling arrest, plaintiff's appeal to the Tenth Circuit of the suppression order, the government's changed position on appeal agreeing no probable cause supported that arrest, and whether the court should have suppressed the evidence discovered in the search incident to arrest.  *See* Doc. 29 at 23–24; Doc. 38 at 29.  Defendants argue "the government's about-face" about how the court should interpret the lurking and prowling ordinance is not "an indication of the accused's innocence."  Doc. 29 at 23.  Instead, they assert, the district court's ruling on the motion to suppress shows "the officers' interpretation of the ordinance was reasonable at the time" and probable cause supported the arrest, even if the government later changed its position on appeal and the court ultimately dismissed the federal case.  *Id.* at 23–24.  And, they contend, the suppression hearing provided plaintiff due process and was a more reliable method to determine if probable cause existed than relying on the government's interpretation on appeal, which they contend changed from the government's initial arguments to the district court because of a change in administration.  *Id.* at 23.  In short, defendants argue that "[t]he circumstances of a newly appointed U.S. Attorney second-guessing the interpretation of an ordinance at the appellate level is not indicative of innocence."  *Id.* at 24.

Plaintiff argues the dismissal was indicative of innocence because, "[h]ad the court granted the motion to suppress, the plaintiff could not have been found guilty and his claim of malicious prosecution would have begun at that time."  Doc. 38 at 29.  He argues that the

government's changed position on appeal shows "the lack of fact[s] to support the conviction" and is "indicative of innocence sufficient to meet the elements of [the malicious prosecution] claim." *Id.* In short, plaintiff contends the dismissal touched the merits of his case because the "dismissal was not out of mercy or other acceptance of responsibility by plaintiff" but resulted because the government couldn't secure a conviction against plaintiff without the suppressed evidence. *Id.*

So, the parties focus their favorable termination arguments on the government's changed position on appeal over what constitutes lurking and prowling and whether this makes the dismissal "indicative of innocence." The real question, however, is whether the dismissal was indicative of plaintiff's innocence *on the federal charge*—felon in possession of ammunition. *See Montoya*, 898 F.3d at 1067–68 (granting qualified immunity for defendants against malicious prosecution claim after examining whether the charges were vacated in a way that indicated the plaintiff was innocent "with respect to the crimes of conviction"). Following Tenth Circuit precedent, the court holds the dismissal of plaintiff's federal conviction here was not indicative of plaintiff's innocence on that charge. This analysis begins with a careful analysis of the leading Circuit precedent on this issue—*Margheim v. Buljko*.

In *Margheim*, plaintiff was arrested after a district attorney filed a motion for an arrest warrant in a domestic violence case, basing the motion on plaintiff failing to comply with the protection order. *Margheim*, 855 F.3d at 1081. But, the district attorney's sworn statement to the court was wrong—plaintiff hadn't committed a new protection order violation since he had last posted bond in the domestic violence case. *Id.* The county court issued the arrest warrant based on the prosecutor's inaccurate statement, and police arrested plaintiff based on the warrant. *Id.* When plaintiff was searched incident to the arrest, the police found drugs on his person. *Id.*

28

And, plaintiff was charged for drug possession and detained pretrial. *Id.* Plaintiff moved to suppress the drug evidence because the arrest warrant lacked probable cause due to the prosecutor's inaccurate statement to the issuing court. *Id.* And, the court agreed. *Id.* It granted his motion to suppress and dismissed the drug case against him. *Id.* Plaintiff then sued the district attorney for malicious prosecution based on the drug charges. *Id.* at 1081–82.

The district attorney argued on appeal that the dismissal of the drug case was not indicative of plaintiff's innocence on the drug charges. *Margheim*, 855 F.3d at 1087–88. The Circuit agreed with her, explaining whether a termination was "favorable" is a legal question. *Id.* And, the Tenth Circuit held the district court should have granted the district attorney qualified immunity on summary judgment and remanded the case to the district court with instructions to grant her qualified immunity. *Id.* at 1083–84, 1090. The Circuit explained that plaintiff could not satisfy the favorable termination element of his malicious prosecution claim, and thus had failed to adduce evidence that the prosecutor had violated of his Fourth Amendment rights. *Id.* The Circuit didn't rely on the dismissal alone to determine if a favorable termination existed. *Id.* at 1086. Instead, it considered if the dismissal in some way indicated plaintiff was innocent of the drug charge. *Id.*

The Circuit gave an example of a favorable termination—a case where the charges were dismissed after certain witness statements were excluded as inadmissible hearsay and the prosecutor determined the government couldn't prove the case beyond a reasonable doubt without the excluded testimony. *Id.* (citing *Wilkins*, 528 F.3d at 795, 802–04). But, the Circuit explained, a dismissal after granting a motion to suppress on technical grounds, with "no or little relation to the evidence's trustworthiness" would not be favorable, because it isn't "indicative of innocence." *Id.* (citations and internal quotation marks omitted). Neither would dismissal on

speedy trial grounds be indicative of innocence because it isn't tied to the case's merits.  *Id.* (citing *Cordova v. City of Albuquerque*, 816 F.3d 645, 650–51 (10th Cir. 2016)).

The Tenth Circuit recognized that the plaintiff had won his suppression motion to exclude the drug evidence, and that—lacking this evidence—the prosecutor dismissed the drug case.  *Margheim*, 855 F.3d at 1089.  But, the basis for dismissal was the arrest warrant's invalidity that had led to the search.  *Id.*  And plaintiff had presented no "information questioning whether he actually possessed the drugs."  *Id.*  So, our Circuit held, "the dismissal of the [d]rug [c]ase was not a favorable termination."  *Id.*  The Circuit also concluded that the district attorney was entitled to qualified immunity because the plaintiff couldn't establish the favorable termination element for his malicious prosecution claim, and thus had not established the requisite constitutional violation.  *Id.* at 1088–90.  Following this conclusion, the Circuit determined it didn't need to address the clearly established prong of the qualified immunity analysis.  *Id.* at 1090.

*Margheim* also explicitly rejected plaintiff's argument that demonstrating the arrest warrant was invalid amounted to a favorable termination because, without the warrant, the prosecutor never would have commenced the drug charge.  *Id.*  The Circuit explained that a "favorable termination" is separate and distinct from the "no probable cause supported the original arrest" element.  *Id.*  And, while plaintiff successfully had argued no probable cause supported the arrest warrant, this didn't amount to a favorable termination in the drug case.  *Id.* The Circuit explained that the invalid warrant might support a false arrest or other Fourth Amendment violation, but plaintiff chose to pursue a malicious prosecution claim, which requires a favorable termination of the original action.  *Id.*

Applying *Margheim*'s holding to this case, the court cannot accept plaintiff's argument that the appeal and subsequent dismissal "touch the merits" and are indicative of plaintiff's innocence for the felon in possession of ammunition charge. Doc. 38 at 29. The government conceded on appeal that the original lurking and prowling arrest lacked probable cause, and thus made the search unlawful. And, it's true that once the court suppressed evidence of the bullets on those grounds, the government couldn't prove its case beyond a reasonable doubt. *See Wilkins*, 528 F.3d at 803 (explaining "inability of a prosecutor to prove a case beyond a reasonable doubt at trial *can be* consistent with the innocence of the accused and can be deemed a favorable termination in favor of the accused," but going on to explain that the court still must look to the "stated reasons for the dismissal" and "the circumstances surrounding it" to determine if the dismissal "indicates the accused's innocence"—*i.e.*, does the "failure to proceed impl[y] a lack of reasonable grounds for the prosecution" (emphasis added) (citations and internal quotation marks omitted)).[19] But, suppressing key evidence alone is not sufficient to establish the favorable termination element. *See Cordova*, 816 F.3d at 652–53 & 653 n.2 (explaining dismissals after key evidence is ruled inadmissible are not necessarily favorable for purposes of a malicious prosecution claim, "even when the crucial evidence was suppressed on *constitutional* grounds").

*Margheim* illustrates this principle because there, the Tenth Circuit held plaintiff had not established the favorable termination element even though the drugs were suppressed after an

---

[19]      In *Wilkins*, plaintiffs alleged police officers coerced false statements from gang members during interviews which implicated plaintiffs in a quadruple homicide, then used these statements to arrest plaintiffs. *Wilkins*, 528 F.3d at 793–94. Plaintiffs asserted § 1983 malicious prosecution claims against the officers. *Id.* at 797–99. The Tenth Circuit agreed that dismissal of the murder charges in this context was a "favorable termination" because the evidence suppressed in the criminal cases was found unreliable and without the unreliable evidence the prosecutor couldn't prove plaintiffs' guilt. *Id.* at 802–04. If the criminal cases were dismissed after evidence was suppressed on grounds unrelated to evidentiary reliability, however, the result may have differed. *See id.* at 804.

illegal arrest warrant and the drug case was dismissed. *Margheim*, 855 F.3d at 1087–90. So, even if probable cause didn't exist to support the lurking and prowling arrest and search incident to arrest, that doesn't mean plaintiff has shown a favorable termination—one indicative of his innocence—of his federal criminal case. *See id.* Instead, the court must focus on whether that dismissal was indicative of plaintiff's innocence on the charge underlying the malicious prosecution claim, which here is felon in possession of ammunition—not lurking and prowling. *Id.* at 1090 (explaining a "favorable termination" is separate and distinct from the "no probable cause supported the original arrest" element).

Plaintiff argues he was maliciously prosecuted in federal court. And that prosecution is the only one that falls within the statute of limitations for his constitutional violation claims. Plaintiff contends the officers, by arresting him for lurking and prowling and testifying about probable cause for that arrest at his suppression hearing, maliciously prosecuted him and caused his continued unlawful incarceration. The district court dismissed plaintiff's felon in possession of ammunition charge and released plaintiff from custody after the government agreed the court should have granted his motion to suppress—*i.e.*, the government agreed the officers did not have probable cause to arrest plaintiff and conduct a search incident to his arrest. This may be indicative of his innocence for lurking and prowling. And, like the *Margheim* plaintiff, perhaps it could have supported a timely claim for false arrest or other Fourth Amendment violation. *Id.* at 1090. But, the court has concluded any such claim is barred by the statute of limitations here. *See* Doc. 23 at 5–11 (explaining how plaintiff's false imprisonment claims are time-barred because he asserts them more than two years after he was indicted, arrested on an arrest warrant, and arraigned in federal court leaving only his malicious prosecution claims to pursue).

And, the dismissal of the charge at issue for plaintiff's malicious prosecution claim—

which he asserts accrued when this court dismissed the federal charge without prejudice and

released plaintiff from custody—wasn't indicative of plaintiff's innocence.  Like the *Margheim*

plaintiff, whose dismissal didn't indicate he actually hadn't possessed illegal drugs, nothing here

indicates plaintiff wasn't a felon and didn't possess of ammunition.  Indeed, video evidence

shows the officers found bullets in plaintiff's pocket.  Nothing indicates this evidence is

unreliable, even if secured under circumstances where the officers lacked probable cause to

search plaintiff incident his arrest.  To the extent plaintiff's constitutional claims are tied to the

lurking and prowling arrest, subsequent search and seizure, or the dismissal of the charge against

him in state court, they fall outside the statute of limitations here.

In sum, plaintiff has failed to meet his burden on the first prong of the qualified immunity

analysis.  He hasn't shown defendants' actions violated a federal constitutional or statutory right

to be free from malicious prosecution because he can't establish favorable termination in the

federal case.  Officer Uhlrig and Officer Goodman thus deserve qualified immunity here.  And,

the court need not reach defendants' remaining arguments on the first prong (probable cause and

malice elements)[20] or the second prong of the analysis (whether the right was clearly established

---

[20]     Much of the evidence plaintiff relies on to establish malice appears to revolve around the officers' testimony at the suppression hearing on the question whether plaintiff was sleeping.  Doc. 38 at 28–29. Plaintiff asserts Officer Uhlrig and Officer Goodman knew he was sleeping because Officer Uhlrig said so on the dispatch audio and Axon video.  *Id.*  And, because they knew he was asleep, he argues they knew probable cause didn't exist for lurking or prowling.  *Id.*  So, he asserts, Officer Uhlrig's testimony at the suppression hearing was "false or inaccurate" and caused his continued incarceration.  *Id.* at 29.

Because the court finds plaintiff's claim fails under the "favorable termination" factor, it need not address the malice element.  But the court notes that the summary judgment evidence fails to establish a triable issue that the officers provided false and misleading testimony.  Officer Uhlrig freely admitted at the suppression hearing that plaintiff may have been sleeping and his statements that he couldn't know with certainty are supported by the video evidence.  *See* Doc. 29-8 at 16, 37, 49, 55–56 (Tr. of Mot. Hr'g 16:22–23 ("[T]here was a subject that appeared to be sleeping or possibly on the ground in front of the front doors . . . ."), 37:5–11 (testifying that, based on his training and experience in "this particular scenario," he believed plaintiff perhaps was intoxicated and "maybe attempted to gain entry into the

at the time of the unlawful conduct).  *See Margheim*, 855 F.3d at 1087 (holding if plaintiff fails

to establish any of the essential elements of a malicious prosecution claim, he fails to establish a

constitutional violation); *Medina*, 252 F.3d at 1128 ("If the plaintiff fails to satisfy either part of

the two-part inquiry, the court must grant the defendant[s] qualified immunity.").  Nevertheless,

the court briefly addresses plaintiff's burden on the second prong of the analysis, below.

### 2.      Was the Constitutional Right Clearly Established?

Plaintiff broadly identifies his right to be free from unlawful search and seizure and

malicious prosecution as clearly established constitutional rights.  Doc. 38 at 2, 19.  Defendants

generally agree that these broad constitutional rights are clearly established.  Defendants

correctly argue, however, that the right must be defined more narrowly for purposes of the

qualified immunity analysis.  *See Herring v. Keenan*, 218 F.3d 1171, 1176 (10th Cir. 2000)

(explaining a "plaintiff cannot simply identify a clearly established right in the abstract and

---

building for some unknown reason and was just tired and laid down to go to sleep"), 49:18–23 (agreeing the person was in the same position when Officer Uhlrig arrived back at the restaurant, but he "didn't know if he was sleeping" and "didn't know why he was there") 55:21–56:2 (testifying he didn't know if plaintiff was sleeping because he "didn't get that close to him to see if he was awake or asleep" but admitting plaintiff "could have been" sleeping because he was in the same position)).

In short, plaintiff hasn't directed the court to any evidence showing that either officer recklessly or intentionally misled the court about whether plaintiff was asleep or not.  *See Stonecipher v. Valles*, 759 F.3d 1134, 1142 (10th Cir. 2014) (explaining where a plaintiff contends an officer misrepresented or omitted material facts to show probable cause, plaintiff must "make a substantial showing of deliberate falsehood or reckless disregard for truth" (citation and internal quotation marks omitted)); *see also Mglej v. Gardner*, __ F.3d __, No. 19-4015, 2020 WL 5384938, at *13 n.14 (10th Cir. Sept. 9, 2020) (explaining "the malice element of a Fourth Amendment malicious prosecution claim focuses on the defendant officer's knowledge or state of mind" rather than "an objective reasonableness standard" and a plaintiff can meet this element by producing "evidence that the defendant officer knowingly made false statements or knew there was no probable cause to support prosecution"); *Novitsky*, 491 F.3d at 1258–59 (explaining a plaintiff must "introduce sufficient evidence" that an officer's arrest without probable cause was intentional, not merely negligent or inadvertent); *cf. Snodderly v. R.U.F.F. Drug Enforcement Task Force*, 239 F.3d 892, 901 (7th Cir. 2001) ("[T]o state a claim for malicious prosecution against the police officers under § 1983, [plaintiff] must do more than merely claim that they arrested and detained him without probable cause[;] rather, he must allege that the officers committed some improper act after they arrested him without probable cause, for example, that they pressured or influenced the prosecutors to indict, made knowing misstatements to the prosecutor, testified untruthfully, or covered up exculpatory evidence").

allege that the defendant has violated it" (citation and internal quotation marks omitted)); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (instructing courts not to define the right at issue "'at a high level of generality'" (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011))). Instead, the court must determine "'whether the violative nature of *particular* conduct is clearly established.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015)); *White*, 137 S. Ct. at 552 (noting the "the clearly established law must be 'particularized' to the facts of the case" (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))).

Officer Uhlrig and Officer Goodman argue that even if they were mistaken in their belief that probable cause existed, they still deserve qualified immunity because plaintiff identifies no Supreme Court, Tenth Circuit, Kansas, or Topeka precedent interpreting the lurking and prowling statute or addressing what amounts to probable cause under analogous circumstances that would have put them on notice that their actions clearly amounted to a Fourth Amendment violation. *See Kaufman v. Higgs*, 697 F.3d 1297, 1300–01 (10th Cir. 2012) (explaining where a state statute is involved, "the precise scope of [the constitutional] right uniquely depends on the contours" of that statute and courts should look to state court decisions to determine if the defendants' interpretations of the statute were "one[s] that a reasonable officer would have held at the time of [plaintiff's] arrest"); *Brown v. Montoya*, 662 F.3d 1152, 1164 (10th Cir. 2011) (explaining right is clearly established if "'there [is] a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts . . . found the law to be as the plaintiff maintains'" (quoting *Stearns v. Clarkson*, 615 F.3d 1278, 1282 (10th Cir. 2010)); *see also Ziglar*, 137 S. Ct. at 1867 (explaining a "reported case directly on point" isn't required for qualified immunity to apply, but the court must evaluate whether "the unlawfulness of the

officer's conduct [is] apparent" "in the light of pre-existing law" (citations and internal quotation marks omitted)).

Officers who "make reasonable but mistaken judgments about open legal questions" still deserve qualified immunity. *al-Kidd*, 563 U.S. at 743; *see also Stonecipher*, 759 F.3d at 1141–42 (noting if "arguable probable cause" exists—*i.e.*, if "the officers' conclusions rest on an objectively reasonable, even if mistaken, belief that probable cause exists"—qualified immunity still applies, and explaining that courts should deny qualified immunity only if "no reasonably competent officer" could have concluded probable cause exists—*i.e.*, only if probable cause was so lacking that any belief in its existence was "entirely unreasonable" (citations and internal quotation marks omitted)). The doctrine of qualified immunity thus "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Ziglar*, 137 S. Ct. at 1867 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). And plaintiff bears the burden to show defendants' actions were clearly unlawful "in light of the pre-existing law such that the state of the law at the time of the incident gave the defendants fair warning that their conduct was unconstitutional." *Novitsky*, 491 F.3d at 1256 (citations, internal quotation marks, and alterations omitted).

Here, plaintiff appears to rely heavily on the plain language of the Topeka ordinance to support his arguments that probable cause didn't exist. *See* Doc. 38 at 24–25. But, the court concludes plaintiff hasn't met his burden to overcome the clearly established prong of the qualified immunity analysis because he hasn't identified any sufficiently analogous case law showing no reasonably competent officer could have concluded probable cause existed under the facts presented here. *See, e.g.*, *Mocek v. City of Albuquerque*, 813 F.3d 912, 922–23, 925–27 (10th Cir. 2015) (granting qualified immunity where Tenth Circuit "doubt[ed] that there was probable cause to arrest" plaintiff for concealing his identity when he failed to provide

36

documents proving his identity at a TSA checkpoint because Tenth Circuit precedent made concealing one's identity a misdemeanor only when the officer had reasonable suspicion of an underlying crime and the New Mexico statute didn't criminalize "the mere failure to produce documentation," but holding "nonetheless[] [that] the officers are entitled to qualified immunity because even assuming they misinterpreted [the statute], their mistake was reasonable"); *Quinn v. Young*, 780 F.3d 998, 1007–09 (10th Cir. 2015) (granting qualified immunity where plaintiff failed to direct the court to "any clearly established law involving such sting operations or an analogous law-enforcement setting" so that the court could "confidently conclude that a reasonable officer engaged in a sting operation . . . would have had fair warning . . . regarding the quantum and quantity of proof necessary to establish probable cause of a larceny offense, especially with respect to a suspect's specific intent" and holding officers "would not have had fair warning that their arrests . . . were lacking in probable cause"); *id.* at 1010–14 (explaining whether clearly established law exists is not as simple as asking whether probable cause supported an arrest, rather, the court must consider if precedent cases provide "appreciable guidance to the [o]fficers . . . on how to assess . . . whether they possessed sufficient evidence . . . to effect the arrests," and rejecting plaintiffs' arguments for a more "generalized approach to clearly-established-law analysis" holding plaintiffs were required "to identify clearly established law by reference to decisions that at least have substantial factual correspondence with the instant case").  *But see Mglej*, 2020 WL 5384938, at *13 (noting "knowingly arresting a defendant without probable cause, leading to the defendant's subsequent confinement and prosecution" is a clearly established constitutional violation where officer lacked even arguable probable cause to charge plaintiff because the plain language of the statutes the officer relied on "clearly do not apply to the circumstances presented in this case"); *Quinn*, 780 F.3d at 1014

(discussing earlier Tenth Circuit case which found law was clearly established without requiring a case with similar facts because the assault statute clearly required signs of force or violence—which hadn't been shown under the facts of the case—and the necessity of such facts was so obvious that "*any* reasonable officer" would have known probable cause didn't exist for an assault arrest under the facts presented, and explaining that the "more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation" (citations and internal quotation marks omitted)); *cf. Keylon v. City of Albuquerque*, 535 F.3d 1210, 1213, 1216–20 (10th Cir. 2008) (holding officer not entitled to qualified immunity after arresting plaintiff for concealing her identity or evading an officer because no reasonable police officer could have believed probable cause existed for the arrest where the New Mexico statute and Supreme Court precedent on identity concealment required the officer to suspect the person of an underlying crime (which wasn't the case there), and the evading an officer statute and New Mexico law required physical evasion or fighting words, which also weren't present).

In sum, plaintiff hasn't presented "sufficiently clear" precedent making it "apparent" to a reasonable officer that arresting plaintiff for lurking and prowling under the circumstances presented here would constitute an arrest without probable cause and violate plaintiff's constitutional rights. *Creighton*, 483 U.S. at 640. He hasn't shown that it was "clearly established that the circumstances with which [the officers] were confronted did not constitute probable cause." *Id.* at 640–41; *see also Gutierrez v. Cobos*, 841 F.3d 895, 901–902, 906–07 (10th Cir. 2016) (explaining a plaintiff must "cite case law or make a legal argument to show how any infringement of [plaintiff's] constitutional rights violated clearly established law" to overcome the clearly established prong of the qualified immunity analysis, and affirming

summary judgment for defendant because plaintiffs "failed to provide legal authority showing it was clear in 2009 that a tasing under these circumstances was a seizure" and thus "did not carry their burden to rebut qualified immunity").

### 3.   Conclusion

Plaintiff hasn't satisfied his burden on either prong of the qualified immunity analysis. He hasn't come forward with facts to satisfy the favorable termination element of his § 1983 malicious prosecution claim, and thus fails to establish a constitutional violation. He also hasn't shown the right at issue was clearly established under the circumstances presented here. Thus, Officer Uhlrig and Officer Goodman deserve qualified immunity.

### B.   *Monell* Claim

The court now turns to the claim against Topeka. A municipal liability claim, often called a *Monell* claim, requires a plaintiff to prove three elements: (1) an official policy or custom, (2) causation, and (3) state of mind. *Hinkle*, 962 F.3d at 1239. "A municipality cannot be held liable for its officers' actions under § 1983 unless those actions were caused by a policy or custom of the municipality." *Novitsky*, 491 F.3d at 1259 (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). "[D]iscretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Novitsky*, 491 F.3d at 1260 (citation and internal quotation marks omitted).

The parties focus their summary judgment argument here on the causation element. The challenged policy "must be closely related to the violation of the plaintiff's federally protected right" for causation to exist—*i.e.*, there must be a "direct causal link" between the municipal action and the constitutional deprivation. *Hinkle*, 962 F.3d at 1241 (citation and internal quotation marks omitted). The municipality's "'*deliberate* conduct,' . . . must have been the

'*moving force*' behind the injury." *Mocek v. City of Albuquerque*, 813 F.3d 912, 933 (10th Cir. 2015) (quoting *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997)) (second emphasis added). And, municipal liability under § 1983 can't exist where the officers' actions did not cause a constitutional violation. *Hinkle*, 962 F.3d at 1226, 1239 (explaining before a municipality can be held liable for a constitutional violation the plaintiff must show that an employee caused a constitutional violation under the municipality's policy); *see also Hinton v. City of Elwood*, 997 F.2d 774, 782 (10th Cir. 1993) (holding, where court found officers hadn't committed an "underlying constitutional violation," the "municipality may not be held liable").

Plaintiff argues Topeka's recording device policy was the moving force behind his arrest. Doc. 38 at 2. Plaintiff contends Topeka caused the alleged violation of his constitutional rights because, he asserts, the violations wouldn't have happened if Topeka didn't give officers discretion not to record certain acts during an investigation. *Id.* He asserts if the entire encounter had been recorded, a court "would have been able to judge appropriately what claimed facts supported the arrest from which evidence was unlawfully obtained . . . ." *Id.* In short, plaintiff believes the policy allowing Officer Uhlrig to turn off his camera "prevent[ed] the disclosure of pretext to arrest and search citizens"—*i.e.*, it allowed the officers to hide the true motivation behind arresting him. *Id.*

Plaintiff relies on the absence of Axon video recording for a period during his arrest and asserts this prevented him from demonstrating that the officers lacked probable cause to arrest him. *Id.* at 26. He speculates that the officers discussed, off camera, whether they had enough facts to support a lurking and prowling arrest. *Id.* at 27. And, without this video, plaintiff didn't have evidence to present in the criminal case to allow the court to judge the officers "on their beliefs at the time." *Id.* at 27. If Topeka didn't have this policy and instead required them to

record everything, plaintiff asserts, the "true motives of law enforcement" would be revealed, which is necessary to protect citizens from unlawful arrests without probable cause and prevent police cover-ups for such arrests.  *Id.*  Thus, plaintiff argues, the City's policy allowing for private conversations "caused or contributed to the violation of plaintiff[']s right to be free from unlawful search, seizure and malicious prosecution" and led to his 19 month incarceration.  *Id.* at 26–27.

Defendants argue Topeka's policy allowing private conversations among officers didn't cause the alleged § 1983 unlawful arrest and subsequent malicious prosecution violating the Fourth and Fourteenth Amendments.  Doc. 29 at 26.  This is so, defendants argue, because even if the officers had discussed, off camera, some "nefarious 'true motivation'" for plaintiff's arrest, the officers' subjective motivations for the arrest are irrelevant—the constitutionality "of an arrest is judged by objective standards."  *Id.*

As discussed above, plaintiff hasn't shown Officer Uhlrig and Officer Goodman committed a constitutional malicious prosecution violation, so his § 1983 claim against Topeka can't survive summary judgment.  *Hinkle*, 962 F.3d at 1226, 1239.  And, even if plaintiff had shown a triable issue on his constitutional violation claim, plaintiff has not established causation.  Defendants correctly argue that probable cause is examined "under an objective standard of reasonableness."  *Quinn v. Young*, 780 F.3d 998, 1006 (10th Cir. 2015).  So, "an officer's own subjective reason for the arrest is irrelevant, and it does not matter whether the arrestee was later charged with a crime."  *Id.* (citations and internal quotation marks omitted).  Even if an officer "subjectively intended to base the arrest on an offense for which probable cause is lacking," no Fourth Amendment violation occurs as "long as the circumstances, viewed objectively, justify the arrest."  *Id.* (citations and internal quotation marks omitted); *see also Devenpeck v. Alford*,

543 U.S. 146, 154–55 (2004) ("Subjective intent of the arresting officer . . . is simply no basis for invalidating an arrest.  [A person is] lawfully arrested [if] the facts known to the arresting officers give probable cause to arrest."); *Mocek v. City of Albuquerque*, 813 F.3d 912, 925 (10th Cir. 2015) ("Probable cause exists if facts and circumstances within the arresting officer's knowledge and of which he or she has reasonably trustworthy information are sufficient to lead a prudent person to believe that the arrestee has committed or is committing an offense.  This is true regardless of the officer's subjective intent." (citations and internal quotation marks omitted)).

Plaintiff hasn't adduced any evidence capable of supporting a finding that but for Topeka's recording policy, the court would have granted his motion to suppress (*i.e.*, his alleged malicious prosecution wouldn't have occurred).  The court in plaintiff's criminal case—rightly or wrongly—found probable cause based on the evidence submitted at the suppression hearing because it was "convinced" by the government's argument that plaintiff's "presence at the scene of a triggered alarm—regardless of whether he was asleep—where criminal damage occurred and a weapon was found nearby gave the officers probable cause to believe that [plaintiff] was there with intent to do mischief or commit some crime."  Doc. 29-12 at 8.  The court based this probable cause determination on the totality of facts known to the officers, but not on their subjective reasons for arresting plaintiff.  The court can't envision how any off-camera conversation here—even if the officers discussed lurking and prowling—would have altered the objective probable cause determination because the officers' subjective intent is irrelevant to this determination.  Thus, even if plaintiff had established a constitutional violation,

plaintiff hasn't shown the causation required to hold Topeka liable based on its policy.  The court

thus grants summary judgment against plaintiff's *Monell* claim.[21]

### IV.     Conclusion

For reasons explained above, the court grants defendants' Motion for Summary Judgment

(Doc. 28).

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants City of

Topeka, Kansas, Brandon Uhlrig, and Zachary Goodman's Motion for Summary Judgment (Doc.

28) is granted.  The court directs the Clerk to enter a judgment in defendants' favor and close the

case.

**IT IS SO ORDERED.**

**Dated this 25th day of September, 2020, at Kansas City, Kansas**

s/ Daniel D. Crabtree

**Daniel D. Crabtree**
**United States District Judge**

---

[21]     Additional video evidence of the officers' discussions potentially could have helped prove other elements of plaintiff's malicious prosecution claims—like malice.  For example, if plaintiff's speculations about the officers having a malicious true motivation for the arrest were true and they had discussed those motivations on camera, or if the officers later testified falsely to support the plaintiff's prosecution and that testimony contradicted their on-camera rationale.  But, that video could not have affected the probable cause determination.  And, Topeka's recording policy still wouldn't have served as the moving force behind the alleged constitutional violation—the moving force would be the officers' allegedly intentional decision to testify falsely or pursue an arrest or prosecution without probable cause.